MICHAEL CRIPS v. AGNES TOWSLEY ET AL.

73 395
f118 254

*Equity—Fraud—Procuring transfer of securities.*

1. Whatever children may think their due from parents, they should not seek to administer their estates till no longer within their living custody.

2. That which has the *effect* of fraud on people who are practically helpless, is subject to the same *consequences* as if it were deliberate and actual fraud.   Courts of equity cannot allow such dealings to stand.

3. In this case the transfer of certain securities, claimed to have been made by complainant to his daughter, is held invalid, for reasons stated in the opinion.

Appeal from Ingham.   (Peck, J.)   Argued January 11, 1889.   Decided January 18, 1889.

Bill to set aside transfer of securities.   Complainant appeals from decree dismissing bill.   Reversed, and decree entered as prayed.   The facts are stated in the opinion.

*John M. Corbin,* for complainant.

*Q. A. Smith,* for defendants.

CAMPBELL, J.   The bill in this   case was filed to rescind a transfer of certain securities claimed by defendants Agnes and William C. Towsley to have been made by complainant to said Agnes.   Defendants Crossman & Williams are bankers in Williamston, with whom the funds were deposited, and are not otherwise involved in the cause.   As this is a family difficulty, we shall not discuss the testimony at large.   The only controversy is practically one of fact, and it is not worth while to perpetuate evidence of the difficulty in detail.

On August 4, 1887, complainant, then an old man of about eighty years, was and had been for a short time an inmate of the house of the Towsleys, Mrs. Towsley being his daughter.   He had other descendants living, and some were dead.   At this time he had a certificate of deposit for a little over $500, issued by Crossman & Williams.   He had one note of $200, and another of $50, and some amount of money, not involved here, and probably not much.   These funds, it is indi-

cated, were what remained of the proceeds of a farm which he had sold some time before, and which had been his home while his wife lived. He had advanced some money to other children, and this was all he had left.

During the hot weather about the beginning of August, he had an attack of bowel complaint, or some such disorder, and was suffering somewhat from it. On the day in question his daughter, Mrs. Towsley, spoke to him of the uncertainty of life, and wanted him to settle his affairs. He had no debts, and no other property to dispose of. Mr. York, an attorney at Williamston, was sent for and came. We shall not discuss the circumstances of the sending, as it is not easy to tell just how much complainant had to do with it, and it is not, in our view, very important to do so. Complainant was very deaf, and could not, probably, follow any conversation not directly addressed to him, and this fact renders it difficult to tell how much that happened was understood by him. Mr. York supposed he was wanted to draw a will. He understood the old gentleman as preferring some less formal method, and that he did not want trouble after he was gone, and wished to arrange matters so that his girls should have his remaining property, as he had already given his son, Philip, his share. He wanted his daughter, Mrs. Towsley, to have the certificate of $500, and another daughter the $200 note. Mr. York told him he could make a will; but he said he did not want a will, but wanted they should have it now, and no expense made, if avoidable. Mr. York told him he could assign the certificate to Mrs. Towsley, and turn over the note to her, and take her written agreement to pay, at his death, to her sister, $200, or he might take her word for it; and he said he could rely on her word. It turned out that the $200 note was not payable to complainant, but to a daughter-in-law, Mary Crips, and Mr. York told

him she would have to indorse it. The papers were thereupon handed over to Mrs. Towsley. Although not mentioned in the direct examination, Mr. York, on cross-examination, said further that complainant expressed a purpose to remain with his daughter, and a confidence that she would take care of him. No agreement was made or stated on her part to have been made by Mrs. Towsley to that effect. This loose arrangement, on which Mr. York's statement is no doubt reliable, is all that took place at that time. Defendant William C. Towsley, at a late hour in the night of the day on which this took place, went to the house of Mary Crips, the daughter-in-law, who had gone to bed, and got her to indorse the $200 note. The certificate of deposit was taken to Williamston for collection, and Mrs. Towsley got another in her own name in its place.

The conversion of the certificate of deposit, which was made the next day, was hastened to avoid trouble with Philip Crips, complainant's son, who, as soon as he heard of the dealings, began to inquire into the matter. It would not be profitable to enlarge on these controversies. Complainant went away from his daughter's, and this suit was begun not long thereafter.

From the whole case we are satisfied that complainant never supposed he was depriving himself of his property absolutely, if he understood he was doing it at all, which we very much doubt. The conduct of Mrs. Towsley in regard to the receipt of money soon after, which complainant evidently considered and was allowed to consider as his own, is only one circumstance tending to show this. The most favorable view we can take of the facts indicates that all which complainant proposed to do was to make some sort of arrangement which should give his securities or their proceeds to his daughters after his death. This was the express arrangement, and the only

one suggested to him concerning the $200 note; and Mr. York does not testify that Mrs. Towsley made even a verbal promise to use it in that way; and the conduct of herself and husband shows an intent to appropriate the money at once to their own use, whatever might be done with it after complainant's death. It is not necessary to impute deliberate fraud in the gross sense to Mrs. Towsley and her husband. But we cannot conceive of any explanation which will acquit them of blame. And while Mr. York no doubt had no wrong purpose, he did not protect the complainant as he should have done.

Nothing could justify completely stripping an old and feeble man of his property, who, if not otherwise deficient beyond the usual weakness of age and illness, was unable, through deafness, to know all that went on near him. There can be no doubt that if he meant to do anything to secure the enjoyment of his estate by his daughter, he expected to be supported during his life, and that without some assurance of this there could have been no conceivable reason for parting with his all. It is shown by the record, not only that Mrs. Towsley made no agreement, verbal or written, to support her father, but that she never had any idea of changing their relations so as to bind her further than she was bound by natural duty. It was not proper for an attorney called in to advise an aged man in disposing of his estate to give him to understand that he could safely act as it is claimed he did act. Furthermore, Mrs. Towsley was not the head of her family, and could not bind her husband to furnish her father with what he needed. Her death, or her husband's refusal, would leave the old man helpless. It is not necessary to review all of the numerous considerations which have led courts to deal with such performances as are set out in this record as unconscionable, whether wickedly designed or not. But it is impossible

to believe, from testimony before us, that complainant understood that he was doing what defendants claim he did. Neither his conduct nor theirs is consistent with such a notion. And if he had done it, the nature of the transaction alone brings it clearly within the rules which disallow such ruinous performances in favor of relatives, who are bound to avoid accepting such benefits as no sensible man would bestow without some assurance of protection against ruin.

If this arrangement falls short of conscious fraud, it is only because of an obtuseness of conscience that is not much better. Whatever children may think their due from parents, they should not seek to administer their estates till no longer within their living custody. That which has the effect of fraud on people who are practically helpless, is subject to the same consequences as if it were deliberate and actual fraud. Courts of equity cannot allow such dealings to stand.

The complainant is entitled to have the property which got into Mrs. Towsley's hands restored to him. The defendant William C. Towsley has mixed himself up in the dealings sufficiently to render him responsible with his wife for the proceeds of the $200 note, if no more. The decree must be reversed, and a proper decree entered in this Court to provide for the relief indicated. Costs of both courts are to be given against Mr. and Mrs. Towsley in favor of complainant. Defendants Crossman & Williams will account to complainant for the funds in their hands, but are not in fault, and will not be charged with costs.

The other Justices concurred.